DECISION AND JOURNAL ENTRY
{¶ 1} Defendant, Justine Davis, appeals from the decision of the Summit County Court of Common Pleas which found her guilty of felonious assault and failure to provide for a functionally impaired person and sentencing her accordingly. We affirm Defendant's convictions, vacate Defendant's sentence, and remand for re-sentencing.
 {¶ 2} Defendant and her husband, William Davis ("Stepfather"), were indicted on April 21, 2003 for felonious assault, in violation of R.C. 2903.11(A)(1), a second degree felony, and failure to provide for Defendant's son Edgar Vannoy (" Edgar"), a functionally impaired person, resulting in serious physical harm, in violation of R.C. 2903.16(A), a fourth degree felony. During the October 2003 joint trial, Defendant moved for Civ.R. 29 acquittal following the State's case in chief. The court denied the motion. The defense did not put on any evidence and the jury found Defendant and Stepfather guilty on both counts. The trial court merged the convictions for purposes of sentencing and sentenced Defendant to the maximum term of eight years for the felonious assault conviction. Defendant timely appealed raising ten assignments of error. For ease of discussion we will discuss some assignments of error together.
 ASSIGNMENT OF ERROR I
"[Defendant] was improperly charged and convicted of a second degree felony under the general statute, R.C. 2903.11(A), prohibiting felonious assault, where the specific statute, R.C.2903.16(A), prohibiting the knowing failure to provide for a functionally impaired person that results in serious physical harm, was enacted to provide a lesser degree offense, namely a fourth degree felony, for the same conduct."
 {¶ 3} In her first assignment of error, Defendant alleges that the trial court erred by convicting her of both felonious assault and failure to provide for a functionally impaired individual where both provisions punish the same conduct. Specifically, Defendant asserts that the legislature enacted the special failure to provide statute in order to impose a different punishment scheme in such cases. Defendant calls to the attention of this Court the vast discrepancy in maximum terms available under both statutes, 18 months for failure to provide versus 8 years for felonious assault, and states that the trial court was permitted only to try her on the special, not the general, statute. We disagree.
 {¶ 4} Principles of statutory construction require that specific statutory provisions prevail over general legislation.State v. Volpe (1988), 38 Ohio St.3d 191, 193. R.C. 1.51 states that:
"If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail."
 {¶ 5} Where the statutes are irreconcilable, for instance where they provide different penalties for the same act, and the special provision was adopted later than the general provision, the prosecutor may only charge a defendant under the special provision. Volpe, 38 Ohio St.3d at 193; State v. Chippendale
(1990), 52 Ohio St.3d 118, paragraph three of the syllabus. However, "R.C. 1.51 comes into play only when a general and a special provision constitute allied offenses of similar import[.]" Chippendale, 52 Ohio St.3d 120. To determine whether or not offenses are allied offenses of similar import, this court compares the elements of each offense in the abstract. State v.Rance, 85 Ohio St.3d 632, paragraph one of the syllabus, 1999-Ohio-291.[1]
 {¶ 6} In this case, Defendant was charged with both felonious assault and failure to provide for a functionally impaired individual. R.C. 2903.11(A) defines felonious assault as "knowingly * * * [c]aus[ing] serious physical harm to another[.]" Under this statute, an individual may be criminally liable for either an act or a failure to act where the natural and direct consequence of that act or failure directly produces the serious physical harm. See R.C. 2901.21(A)(1); R.C. 2903.11(A). On the other hand, R.C. 2903.16(A) provides that:
"No caretaker shall knowingly fail to provide a functionally impaired person under the caretaker's care with any treatment, care, goods, or service that is necessary to maintain the health or safety of the functionally impaired person when this failure results in * * * serious physical harm to the functionally impaired person."
 {¶ 7} Undoubtedly, both statutes include a knowingly element and a serious physical harm element. See R.C. 2903.11; R.C.2903.16. However, felonious assault requires one to knowingly cause serious physical harm while failure to provide for a functionally impaired individual requires knowingly failing to provide alone. See R.C. 2903.11; R.C. 2903.16. Failure to provide for a functionally impaired individual does not require one to knowingly cause any harm. See R.C. 2903.16. Harm must simply result from a caretaker's failure to provide. See id. Felonious assault, on the other hand, requires one to know that her act, or failure to act, will cause serious physical harm. See R.C.2903.11. Both require proof of different elements, and conviction on either will not necessarily result in a conviction on both.
 {¶ 8} For example, a caretaker who knows that she is not providing medical treatment over a long period of time to a functionally impaired individual, but who honestly and mistakenly believes that such lack of care will not cause any harm, may still be convicted for failure to provide if that failure to provide does, in fact, cause such harm. Likewise, an individual not responsible for the care of a functionally impaired individual may never be held liable under the failure to provide statute, but may still be guilty under the felonious assault statute for knowingly causing harm to an individual who, unbeknownst to them, is functionally impaired.
 {¶ 9} Failure to provide for a functionally impaired individual and felonious assault are not allied offenses of similar import under Rance. The statutes are, therefore, not irreconcilable under R.C. 1.51 and the State properly could charge Defendant under both statutes. Accordingly, we overrule Defendant's first assignment of error.
 ASSIGNMENT OF ERROR II
"[Defendant] was denied effective assistance of counsel where trial counsel failed to object to [the] felonious assault charge under R.C. 2903.11(A), where R.C. 2903.16(A), prohibiting failure to provide for a functionally impaired person that results in serious physical harm, was specifically enacted to provide a lesser degree offense for the same conduct."
 {¶ 10} In her second assignment of error, Defendant argues that she received ineffective assistance of counsel because defense counsel did not object to the felonious assault charge when the failure to provide statute "specifically provide[d] for a lesser degree offense for the same alleged conduct[.]" In other words, Defendant basically re-alleges her first assignment of error in the context of ineffective assistance of counsel.
 {¶ 11} In evaluating an ineffective assistance of counsel claim, this court employs a two step process as described inStrickland v. Washington (1984), 466 U.S. 668, 687,80 L.Ed.2d 674. First, the court must determine whether there was a "substantial violation of any of defense counsel's essential duties to his client." State v. Bradley (1989),42 Ohio St.3d 136, 141; State v. Lytle (1976), 48 Ohio St.2d 391, 396. Licensed attorneys are presumed competent in Ohio. Lytle,48 Ohio St.2d at 397. Defendant must overcome the "presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, quoting Michel v. Louisiana (1955), 350 U.S. 91, 101.
 {¶ 12} Second, the court must determine if prejudice resulted to Defendant from counsel's ineffectiveness. Bradley,42 Ohio St.3d at 141-42. Prejudice exists where the trial result would have been different but for the alleged deficiencies of counsel. Id. at paragraph three of the syllabus. Defendant bears the burden of proof, and must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." State v. Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 48-49, quoting Strickland,466 U.S. at 687.
 {¶ 13} This court need not address both elements in any particular order — if we find there was no prejudice to Defendant by defense counsel's acts, we need not address whether defense counsel's acts were actually deficient. See Bradley,42 Ohio St.3d at 143. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed." Id.
 {¶ 14} Given our determination as to Defendant's first assignment of error, we find that no prejudice resulted from defense counsel's failure to object to the felonious assault charge. Because that statute and the failure to provide statute are separate charges, with separate elements of proof, which are not irreconcilable, the State could properly charge Defendant under both statutes. See Volpe, 38 Ohio St.3d at 193;Chippendale, 52 Ohio St.3d 118, paragraph three of the syllabus. We, therefore, overrule Defendant's second assignment of error.
 ASSIGNMENT OF ERROR III
"The trial court erred in failing to instruct the jury on the lesser included charges of assault under R.C. 2903.13(A) and (B)."
 ASSIGNMENT OF ERROR IV
"The trial court erred in failing to instruct the jury on the lesser included charges of failing to provide for a functionally impaired person under R.C 2903.16."
 {¶ 15} In her third and fourth assignments of error, Defendant contends that the court erred by failing to give certain jury instructions on lesser included offenses. Specifically, Defendant alleges that the court was required to give instructions on the lesser included offenses of assault and failure to provide for an impaired individual. The failure of the trial court to include those instructions, she asserts, amounted to plain error. We find Defendant's assertions meritless.
 {¶ 16} Absent plain error, a party waives any challenge to jury instructions in a criminal case unless that party" objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A); State v. Braden, 98 Ohio St.3d 354,2003-Ohio-1325, at ¶ 75. Appellant failed to object at trial to the jury instructions, but has claimed plain error on appeal.
 {¶ 17} Plain errors and defects affecting substantial rights may be addressed by this Court even when they were not brought to the attention of the trial court. Crim.R. 52(B). Crim.R. 52(B) places three limitations on the decision of a reviewing court to correct an error despite the absence of a timely objection at trial. State v. Barnes, 94 Ohio St.3d 21, 27, 2002-Ohio-68. There must first be an error or deviation from a legal rule. Id., citing State v. Hill, 92 Ohio St.3d 191, 200, 2001-Ohio-141. Second, the error must be plain — it must "be an `obvious' defect in the trial proceedings." Barnes, 94 Ohio St.3d at 27, citingState v. Sanders, 92 Ohio St.3d 245, 257, 2001-Ohio-189. Finally, the error must have affected substantial rights to the point that the court's error affected the outcome of the trial.Barnes, 94 Ohio St.3d at 27. Plain error is defined as "error but for the occurrence of which it can be said that the outcome of the trial would have clearly been otherwise." State v.Sanders (May 17, 2000), 9th Dist. No. 19783, at 3. The plain error doctrine should be applied sparingly and only when necessary to prevent a clear miscarriage of justice. Id., citingState v. Wolery (1976), 46 Ohio St.2d 316, 327.
 {¶ 18} While a trial court does have a duty to include instructions on lesser included offenses, a defendant still retains the right, through counsel, to waive such instructions.State v. Clayton (1980), 62 Ohio St.2d 45, 47 n. 2. Given this right to waive jury instructions on lesser included offenses, plain error does not lie where trial counsel failed to request jury instructions on lesser included offenses as a matter of trial strategy. Id. at 47. Defendant in this case has offered no evidence showing that trial counsel's decision not to request those instructions was anything other than sound trial strategy aimed at acquiring a complete acquittal. Plain error, therefore, does not lie, and we overrule Defendant's third and fourth assignments of error.
 ASSIGNMENT OF ERROR V
"The trial court erroneously instructed the jury that `any condition of such gravity as to require hospitalization' constitutes a `serious physical harm.'"
 {¶ 19} In her fifth assignment of error, Defendant asserts that the trial court erred by giving an erroneous jury instruction defining "serious physical harm." Defendant argues that the definition incorrectly included "any condition of such gravity as to require hospitalization[,]" and that hospitalization alone is inadequate in and of itself to show serious physical harm. Defendant appears to allege that this defect was plain error. We disagree.
 {¶ 20} As noted above, a defendant waives error as to erroneous jury instructions below when she does not object, and does not allege plain error on appeal. Crim.R. 30(A); Braden at ¶ 75. Plain error exists only where the outcome of the trial would have clearly been different absent the error. State v.Sanders (May 17, 2000), 9th Dist. No. 19783, at 4.
 {¶ 21} R.C. 2901.01(A)(5) defines serious physical harm as:
"(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
"(b) Any physical harm that carries a substantial risk of death:
"(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity.
"(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
"(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."
 {¶ 22} The trial court instructed the jury virtually word for word from the statute with the exception of R.C.2901.01(A)(5)(a). As to that portion of the statute, the court stated that serious physical harm included "any condition of such gravity as to require hospitalization[,]" and failed to incorporate the language regarding "mental illness or condition[.]"
 {¶ 23} The evidence at trial showed that Edgar was hospitalized for two days with life threatening dehydration and malnourishment. At 5'5'', he weighed only 92 pounds and was emaciated. Multiple witnesses testified that Edgar looked like a prisoner of war, was dirty, and smelled of urine and feces. Following the removal of Edgar from the care of Defendant and her husband, his condition improved dramatically. Given the evidence at trial, we cannot say that the outcome of Defendant's trial would clearly have been different had the court used the exact wording of R.C. 2901.01(A)(5) to define serious physical harm. The jury could also have found serious physical harm existed under other portions of the statute. Plain error does not lie in this case. We, therefore, overrule Defendant's fifth assignment of error.
 ASSIGNMENT OF ERROR VI
"The trial court erred in denying [Defendant's] motion for acquittal under [Crim.R.] 29, in that there was insufficient evidence to sustain [Defendant's] conviction for felonious assault and failure to provide for a functionally impaired person."
 ASSIGNMENT OF ERROR VII
"The jury's verdicts finding [Defendant] guilty of felonious assault and failure to provide for a functionally impaired person [were] against the manifest weight of the evidence."
 {¶ 24} In her sixth and seventh assignments of error, Defendant alleges that the jury's verdicts were both supported by insufficient evidence as a matter of law and against the manifest weight of the evidence. Specifically, Defendant states that the State failed to offer evidence that Defendant knowingly caused serious physical harm to Edgar during the time between March 27, 2003, and April 3, 2003 as alleged in the indictment. We find that Defendant's assertions lack merit.
 {¶ 25} Sufficiency of the evidence produced by the State and weight of the evidence adduced at trial are legally distinct issues. State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52. Under a challenge to sufficiency of the evidence, Crim.R. 29(A) states that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." However, if the record demonstrates that reasonable minds may reach differing conclusions as to the proof of material elements of a crime, a trial court may not grant a defendant's Crim.R. 29(A) motion for acquittal. State v. Smith, 9th Dist. No. 20885, 2002-Ohio-3034, at ¶ 7, citing State v. Wolfe (1988), 51 Ohio App.3d 215, 216. "`In essence, sufficiency is a test of adequacy.'" Smith at ¶ 7, quoting Thompkins, 78 Ohio St.3d at 386.
 {¶ 26} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v.Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citingThompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant maintains that her conviction is against the manifest weight of the evidence:
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
An appellate court should only invoke this power in extraordinary circumstances where the evidence presented at trial weighs heavily in favor of a defendant. Id.
 {¶ 27} Defendant in this case was convicted of felonious assault, in violation of R.C. 2903.11(A)(1), and failure to provide for a functionally impaired individual, in violation of R.C. 2903.16(A). To convict Defendant of felonious assault the State must have proven that she" knowingly * * * [c]aus[ed] serious physical harm" to Edgar either via an act or a failure to act where the natural and direct consequence of that act or failure directly produced the serious physical harm. R.C.2903.11(A)(1). For failure to provide for a functionally impaired individual, the State must show that (1) Edgar was a functionally impaired individual, (2) Defendant was a caretaker for Edgar, (3) Defendant knowingly failed to provide Edgar with treatment, care, goods, or services necessary to maintain his health or safety, and (4) this failure resulted in serious physical harm to Edgar. See R.C. 2903.16(A).
 {¶ 28} The evidence at trial showed that Edgar suffered permanent brain damage when he stopped breathing for some time during a bout with jaundice when he was six months old. The brain damage left Edgar with an IQ under 50 and the functioning capabilities of a four or five year old. Edgar was Defendant's natural child, and she retained custody of Edgar throughout his life. After their marriage in 1984, Defendant and Stepfather had jointly cared for Edgar.
 {¶ 29} Until 1998, Edgar had attended Weaver School, a government funded day school for children and adults with an IQ under 50. The school served to teach functional academics, including skills for coping in society. Two employees of Weaver School recalled working with Edgar prior to 1998. Both rememberd that he was capable of going to the bathroom by himself and eating alone. He could also communicate using some sign language. Defendant removed Edgar from the school in 1998 because she stated they were moving to Colorado. One teacher actually followed up to verify whether or not Defendant and Edgar had moved from their address because "[she] wanted to make sure that they had actually moved and not just pull[ed] Edgar out of the program." When she discovered the address was vacant, she assumed they had moved to Colorado, and not simply to another street in the same vicinity. Both employees implied that Edgar was happy and healthy during his many years at Weaver School.
 {¶ 30} When their move to Colorado fell through in 1998, they moved to another house in the same vicinity. Defendant and Stepfather failed to re-enroll Edgar into Weaver School or any other day program, though this would not have personally cost them any money. They also did not take him for regular visits to a doctor or dentist, regardless of the fact that the expenses would have been completely covered by Medicaid.
 {¶ 31} Approximately five years after Edgar was removed from Weaver School, Jesse Littleton ("Littleton"), lived with Defendant, Stepfather, and Edgar at their residence for a few weeks. While he was living there, he, Defendant, Stepfather, and Edgar would occasionally visit the home of his fiancée. She recalled that Edgar was always dirty and smelled, and that "[Defendant] would tell [Edgar] * * * not to touch anything [at the fiancée's house] because if he did, they [would] smack him * * * [or] if he stole anything, they would have let [the fiancée and Littleton] smack him." She also said that Littleton would buy Defendant and Stepfather beer on occasion, and that he had wanted to buy food for Edgar. Littleton, apparently, discussed the situation that existed at Defendant's home with his fiancée. She encouraged him to call the police, and, sometime before April 3, 2003, he did call to report what he believed was the improper treatment of Edgar.[2]
 {¶ 32} Littleton moved out of the home the evening of April 3, 2003. According to Defendant, she, Stepfather and Edgar had gone to Ponderosa for dinner that night, and they were surprised to find that Littleton had moved out when they returned. Police arrived at Defendant's house around 9 p.m. that same evening in order to check on Edgar. They knocked on the front door of the home, and Defendant answered, eventually inviting them inside. The officers noted that the house smelled horribly of feces, urine, and garbage. They spent turns outside on the porch in order to get some fresh air.
 {¶ 33} Defendant brought Edgar down from his upstairs bedroom for the officers to see. Both indicated that he looked like a prisoner of war: very thin, as though he had not eaten enough, and dirty. They tried to communicate with Edgar, but he merely hid behind Defendant and would not in any way respond to the officers. One of the officers then asked to look in Defendant's kitchen. He discovered that there was no food on the shelves. He found nothing but a twelve pack of beer in the refrigerator and empty beer cans in the sink. Defendant explained to him that she did not receive her food stamps until the next day and would go grocery shopping then. Both Defendant and Stepfather stated that they had actually just returned from eating at Ponderosa where "Edgar had eaten like a horse[.]"[3]
 {¶ 34} The officer also asked Defendant about the noise of barking dogs that drifted down from upstairs. She explained that she had fourteen dogs living in her and her husband's bedroom. "[She] said they were like the children that her and [Stepfather] never had." Defendant insisted that the dogs were never allowed into Edgar's room. The officers requested to see Edgar's room. Defendant, however, refused to grant them permission to do so. The officers also asked Defendant about the disarray of the house, and Defendant explained that they were preparing to move.
 {¶ 35} The officers called paramedics to the scene to check on Edgar's health. Following a Tartar test, the paramedics determined that Edgar was dehydrated, and transported him to the hospital. Defendant rode in the ambulance with Edgar while Stepfather followed in the family car.
 {¶ 36} Edgar was admitted to the hospital for two days to combat "life-threatening" dehydration and malnourishment. Records indicate that Edgar was so emaciated that his bones stuck out, and that his stomach was indented. At 5'5'', he weighed a mere 92 pounds and was described as" severe[ly] underweight." He was also anemic, had lacerations on his legs, and dermatitis from an allergic reaction on his arms. The hospital used an IV to hydrate him with two liters of saline, and replenished the essential nutrients he was lacking.
 {¶ 37} Debra Smith ("Smith"), an investigator for the Summit County Board of Mental Retardation and Developmental Disabilities, met with Edgar at the hospital. "[She] was mortified when [she] first saw him. He was very, very, very thin. Appeared to be very malnourished * * * almost like somebody you would see walking out of a POW camp." She took pictures of Edgar, including the marks on his back, the protrusion of his rib cage, the indentation in his stomach, and the abrasions on lesions on his legs and toes. She recalled that he had arrived at the hospital in urine and feces soaked clothing. After the hospital staff cleaned him up, Smith spent some time with Edgar as he ate ice cream.
 {¶ 38} Smith also spoke to Defendant and Stepfather at the hospital. Defendant could not seem to understand how Edgar could be diagnosed with dehydration and malnutrition. Smith said that "[Defendant] didn't seem to be able to grasp the seriousness of Edgar's condition." Defendant only understood that Edgar was sick. Smith said that Defendant and Stepfather spent more time talking about their dogs than about Edgar. "They were very excited about the dogs. They talked about the dogs they owned and that they told us all their names and all about just stories about the dogs, and what they were like, and what they looked like."
 {¶ 39} Following her discussion with Defendant and Stepfather, she requested a protective order and respite care for Edgar because she "felt that Edgar had been severely neglected by his parents." She also sent a letter in order to stop payment of Edgar's $552 per month government benefits to Defendant. Defendant did receive Edgar's April benefits even though Edgar was removed from her care on April 3, 2003.
 {¶ 40} On April 10, 2003, Dr. Islam Ibrahim met with Edgar for the first time. In that first week, Edgar had gained 12 pounds.[4] Dr. Ibrahim prescribed Ensure to help Edgar gain weight, and cleared out wax impaction in Edgar's ears. He insisted that an individual should be able to recognize severe dehydration, though maybe not mild dehydration. He also stated that Edgar's condition was consistent with someone who was not given enough to eat and drink every day, and that the dehydration could not have been caused by the flu which Edgar had a week prior to his hospital admittance. Left untreated, Dr. Ibrahim indicated that Edgar's dehydration and malnourishment could have led to death, kidney and liver problems, and changes in Edgar's mental status. He felt that the hospital was prudent in admitting Edgar.
 {¶ 41} On the same day that Dr. Ibrahim first met Edgar, two officers met with Defendant and Stepfather at a coffee shop in Kenmore to learn more about Edgar and his situation. Defendant told them that Edgar spent his days playing with his toys, which were packed up at that time in anticipation of another planned move. She insisted that Edgar could talk, and actually talked to himself all the time. He had no problems communicating. Defendant also indicated that Edgar had a temper and would" tear up things on occasion and throw fits from time to time." When Edgar acted out, she would discipline him by sending him to his room upstairs. She insisted that they would never use any "form of corporal punishment or any kind of restrains on him."
 {¶ 42} As to Edgar's health, Defendant stated that she made sure that he ate before either her or Stepfather. She said Edgar had a "healthy appetite. In fact, she compared it to eating like a pig. She said he drank at least a gallon of water every day and that in addition to several snacks, he would eat throughout the day." She apparently could not understand how Edgar had become dehydrated and malnourished, though one officer indicated he was not sure if she simply did not understand or was just lying.
 {¶ 43} Throughout the interview, Defendant consistently talked more about her fourteen dogs than about Edgar. She said, more than once, that they were "like her children * * * that her and [Stepfather] never had." The dogs, she insisted, always slept in her bedroom. She wanted to find homes for the dogs, but had been unsuccessful.
 {¶ 44} After the interview, Defendant and Stepfather followed the officers back to their home where the officers, and multiple others, executed a search warrant. The officers did not tell Defendant about the search warrant until near the end of their discussion at the coffee shop.
 {¶ 45} Detective John Bell ("Bell") said the first thing they noticed about the house was the smell. While Bell smelled ammonia in the front room, as though someone had tried to clean up the home some, he still found that "the smell was really unbearable. [Bell] stayed there approximately half an hour, but [he] had to go outside and * * * get some fresh air." Many of the detectives assisting in the search actually wore masks inside the home because "[t]he stench [was] pretty much unbearable without a mask." The smell permeated the entirety of the house, and was not limited to any specific room.
 {¶ 46} Bell checked the condition of Edgar's room, and found that it contained a lot of debris and waste. Duct tape lined the door of Edgar's bedroom, and there were holes in the wall consistent with a hammer that was found on the ground. There was also an area of exposed wall in the bedroom. The room, like the entire house, smelled of "stale urine [and the] stench was more significant in that room and the whole upstairs [than the rest of the house]." A grate covered the only window in the room, and a fence was laid across the door to the bedroom closet. Almost the entire floor was stained, as were most of the walls.
 {¶ 47} Edgar's bed was actually folded up in a separate bedroom and the officers had to move it into Edgar's room in order to open the bed. Handcuffs, which Defendant said were Edgar's favorite toy, were attached to the bars on the bed. The sheet and blankets on the bed were heavily stained and smelled of urine. The underside of the mattress was stained and covered with holes. The State actually entered into evidence a cross section of the mattress at trial in order to show how it was stained throughout. The State also entered the handcuffs and sheets from Edgar's bed into evidence.
 {¶ 48} Bell also looked into Defendant and Stepfather's room: he was surprised to find that it contained fourteen healthy dogs with collars on. "They were just jumping all over the room as though they had been locked in the room for some time." He noted that they had adequate food and water. Another officer recalled that Defendant proudly showed the officers her kennel license for the dogs. The State also entered that $67 license, dated January 2003, into evidence at trial.
 {¶ 49} Consistent with Defendant's explanation as to receipt of food stamps, the kitchen, at that time, contained shelves full of unopened food. Officers also noted that the kitchen contained multiple working appliances, such as a crock pot, can opener, stove, and refrigerator. They found that the water worked properly, and that there were freshly cleaned dishes drying in a strainer next to the sink. In the basement, the officers discovered open cans of cat food on the floor, and a cat roaming around in the overhead pipes.
 {¶ 50} During the search, Smith also came to the home to investigate the conditions at Defendant's home. The first thing she noticed as she drove up was that the home had a satellite dish. Before going into the house, she put on a mask in order to help with the smell; "[i]t smelled through the mask. It smelled horrible." Smith also inquired about Edgar's hearing aid. Defendant at first insisted that she had lost it. She felt "[Edgar] was just ignoring her[,]" and really had no need for the hearing aids. Defendant did go into the house and look for them after an officer insisted that she make an attempt, and she returned with one to give to Smith. Smith also asked Defendant about her impending move. On that day, Defendant stated that they were planning to move to Colorado, or one of multiple other places, though Defendant was "kind of all over with that conversation."
 {¶ 51} Defendant did ask when they would be returning Edgar to her care. Up to the date of trial, Edgar was never returned to her custody. Rather, he was immediately placed in protective custody. An investigator for the Summit County Probate Court recommended a guardianship, finding that Edgar was unable to communicate or make decisions for himself. Edgar was, therefore, placed in the care of a certified foster parent, Lucinda Hill ("Hill").
 {¶ 52} Hill, along with her husband and son who were also certified foster parents, specialized in working with mentally retarded adult males. At the time of trial, she had two adult men living under her care, including Edgar. "When he came, he was very weak, and he had sores on him. He was very thin." She recalled that Edgar had sores over much of his body, and that he constantly scratched them. He could walk unaided, but he walked with a "stumbly" gait that was very weak.
 {¶ 53} As to Edgar's eating habits, she said that "[h]e loved to eat." During the first few weeks that Edgar stayed in her home, she would actually find food missing. Hill said that Edgar would "steal food" from the kitchen, as she would find the wrappers under his bed when she cleaned his room. Edgar would also try to take food out of the hands of the other man that they cared for. "[I]f you put your glass down, he drink up your water or whatever you were drinking." She had to limit his food intake because he would make himself sick by eating too much. In general, Edgar could not feed himself. Hill had to cook for him, and she had never seen Edgar get a glass of water by himself. Rather, the other man that she cared for would usually get Edgar water to drink.
 {¶ 54} Hill said that Edgar could not go to the bathroom by himself. She had to wipe for him in order to prevent him from making a mess. Otherwise, Edgar never had any issues with incontinence or wetting the bed. However, she did describe Edgar as "self-stimulating" meaning that he would often "sit and play with the hair on his arms for long lengths of time." Another witness, Smith, testified that self-stimulation:
"occurs when someone has not received stimulation in other ways. When they are in a situation without someone spending time with them, without color, without some form of stimulation in other ways, things that people can see and do. It comes as a result of severe almost boredom, when there is no other stimulation in * * * their environment. * * * It can manifest itself in many ways. It can manifest itself in * * * pulling hair, in rubbing, in picking at your skin."
 {¶ 55} Edgar could communicate some by using sign language. He could also say his name, yes, no, and hello. He loved to scribble in composition books, and look at maps and calendars. He was enrolled in SociAbilities, and was always in a hurry to go. At the time of trial, Edgar no longer was stealing food, and had gained 46 pounds so that, at 138 pounds, he fell comfortably within the recommended weigh range stated by Dr. Ibrahim. Edgar could also no longer wear the same clothing, as he gained three sizes.
 {¶ 56} Given the evidence at trial, we cannot say that the jury clearly lost its way and committed a miscarriage of justice. The State offered evidence tending to show that Defendant should have known that Edgar was not receiving enough food and water. Defendant, as Edgar's caretaker, therefore was knowingly failing to provide necessary food and supplies to her functionally impaired son. The State also offered evidence, buffered by common sense, illustrating that anyone should know that withholding adequate food and water from another individual over an extended time period will generally cause serious physical harm.
 {¶ 57} While the defense elicited testimony on cross examination that indicated that Defendant might not have understood that such failure to act would cause serious physical harm to Edgar, we will not overturn the verdict on a manifest weight challenge simply because the jury chose to believe evidence offered by the prosecution. State v. Merryman, 9th Dist. No. 02CA008109, 2003-Ohio-4528, at ¶ 28, quoting State v.Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757. A finding that a conviction is supported by the weight of the evidence, also includes a finding of sufficiency of the evidence. Smith
at ¶ 9, quoting State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4. Accordingly, we overrule Defendant's sixth and seventh assignments of error.
 ASSIGNMENT OF ERROR VIII
"The trial court erred in entering a conviction against [Defendant] on Count II of the indictment, a fourth degree felony for failure to provide for a functionally impaired person resulting in serious physical harm, where the jury's verdict form failed to specify the felony-enhancement element."
 {¶ 58} In her eight assignment of error, Defendant argues that the trial court erred by entering a conviction against her for failing to provide for a functionally impaired person when the jury verdict form failed to include the specific provision under which Defendant was charged. R.C. 2903.16 provides for two separate degrees of offense relating to the amount of harm caused by a knowing failure to provide for a functionally impaired individual. Failure to provide causing physical harm results in a first degree misdemeanor charge, while that same failure to provide causing serious physical harm results in a fourth degree felony charge. As the jury verdict form failed to explicitly state which provision Defendant was convicted under, Defendant asserts that the trial court erred in entering a conviction on the greater offense. We disagree.
 {¶ 59} While Defendant failed to object below to this particular error, this type of error actually prejudices the State, not Defendant, and thus Defendant need not object below to preserve the issue on appeal. State v. Gleason (1996),110 Ohio App.3d 240, 248. When the presence of one or more additional elements makes an offense one of a more serious degree, R.C.2945.75(A)(2) requires a guilty verdict to state the degree of the offense for which the defendant was found guilty. When the verdict form fails to do so, the verdict "constitutes a finding of guilty of the least degree of the offense charged." R.C.2945.75(A)(2). A trial court, however, substantially complies with R.C. 2945.75(A)(2) where the indictment is read to the jury or the jury was instructed on the proper elements of the offense.State v. Burrow (2000), 140 Ohio App.3d 466, 470.
 {¶ 60} Failure to provide for a functionally impaired individual may be either a misdemeanor of the first degree or a felony of the fourth degree depending upon the level of harm the functionally impaired individual suffers. R.C. 2903.16(C)(1). The verdict form in this case did not include a specification for which level of harm Defendant was convicted of. However, the jury instructions comprehensively covered only the fourth degree felony portion of R.C. 2903.16(C)(1) which required serious physical harm for a conviction. The jury was, at no time, instructed that Defendant could be convicted under the statute if Edgar suffered anything less than serious physical harm. The trial court, therefore, has substantially complied with R.C.2945.75(A)(2) by properly instructing the jury on only the level of offense involving serious physical harm. The jury had no choice but to either acquit or convict based on a proper instruction for the fourth degree felony. They could not have convicted Defendant on anything less because they received no instruction on any other level of offense.
 {¶ 61} Defendant states that the giving of proper jury instructions relating only to the fourth degree felony offense alone is not enough to achieve substantial compliance with the statute. Defendant cites language from both the First and Fourth District Courts of Appeals which she believes supports an argument that courts should require four elements: (1) that the verdict's language was incorporated the indictment; (2) that proper jury instructions on the offense were given to the jury; (3) that the evidence overwhelmingly showed aggravating factors; and (4) that the defendant failed to raise the adequacy of the verdict form at trial. See Burrow, 140 Ohio App.3d at 470;State v. Wireman, 4th Dist. No. 01CA662, 2002-Ohio-1526, at ¶ 16. Defendant challenges only the first purported element, stating that the failure of the verdict form to incorporate the indictment alone defeats substantial compliance in this case.
 {¶ 62} Not only is Burrow factually distinguishable from this case,[5] but Burrow does not stand for the proposition that these four elements must be met in order to find substantial compliance. Rather, Burrow stated that:
"[One] court found that the failure to strictly comply with R.C. 2945.75 did not constitute reversible error where the verdict form incorporated the language of the indictments, the evidence overwhelmingly showed the presence of aggravating circumstances, and the defendant failed to object at trial to the form of the verdict. Other courts have found substantial compliance with R.C. 2945.75 where the indictment was read to the jury or the language of the offense was included in the charge to the jury. The findings of statutory compliance hinge on the fact that the jury was read the indictment or was otherwise instructedon the proper elements of the offense by the trial court." (Internal citations omitted. Emphasis added.) Burrow,140 Ohio App.3d at 470.
 {¶ 63} While the court then went on to look at all of the factors which other courts had considered, the court never held that there were specific elements which must be met in order to find substantial compliance. See Id. The court, instead, recognized that the trial court could substantially comply byeither reading the indictment to the jury or properly instructing them on the elements of the offense. See Id. As toWireman, that case depended entirely upon Burrow for the proposition that four elements must be met in order to find substantial compliance, offering no explanation for that inclusion. See Wireman at ¶ 16. As noted above, Burrow
required nothing of the sort.
 {¶ 64} We find that Burrow was correct in requiringeither incorporation of the language of the indictment into the verdict form or proper jury instruction which leaves no doubt as to the level of the offense for which a defendant was convicted. See Burrow, 140 Ohio App.3d at 470. Where the jury instructions do not give the jury any meaningful opportunity to convict a defendant of anything but one level of the offense, there is no need for the indictment to be read to the jury or incorporated into the verdict form in order to determine the level of offense of a defendant's conviction. The jury instructions in this case left no doubt that Defendant could only be convicted of failure to provide for a functionally impaired individual if she caused serious physical harm. The jury could not have convicted Defendant of the lesser offense, which required only physical harm. Accordingly, we find that the trial court substantially complied with R.C. 2945.75, and we overrule Defendant's eighth assignment of error.
 ASSIGNMENT OF ERROR IX
"The trial court erred in sentencing [Defendant] to greater than the minimum prison term for felonious assault."
 ASSIGNMENT OF ERROR X
"The trial court erred in sentencing [Defendant] to the maximum prison term for felonious assault."
 {¶ 65} In her final two assignments of error, Defendant alleges that the trial court erred in sentencing her to the maximum prison term for felonious assault. Defendant states that the court failed to make the requisite findings on the record supporting imposition of the maximum term. We agree.
 {¶ 66} R.C. 2929.14(B) requires the trial court to make specific statutory findings on the record when imposing a more than minimum sentence. Where a defendant is not currently in prison, or has not previously served a prison term, the court must specifically find that "the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender[.]" R.C.2929.14(B)(2). The court must make that finding orally at the sentencing hearing. State v. Comer, 99 Ohio St.3d 463,2003-Ohio-4165, paragraph two of the syllabus.
 {¶ 67} A court may impose the maximum permitted sentence on an offender where the court finds that the offender committed the worst form of the offense or that the offender poses the greatest likelihood of committing future offenses. R.C. 2929.14(C). When the court sentences a defendant to a maximum prison term, the court must also state its reasons for doing so on the record. R.C. 2929.19(B)(2)(d); See Comer at ¶ 20.[6]
 {¶ 68} In this particular case, the State concedes that the trial court failed to make the requisite statutory findings on the record at the sentencing hearing. We, accordingly, vacate Defendant's sentence, and remand for re-sentencing so that the court may make the required findings on the record at the sentencing hearing per Comer.
 {¶ 69} We overrule Defendant's first through eighth assignments of error, and sustain her ninth and tenth assignments of error. Accordingly, we affirm the judgment of the Summit County Court of Common Pleas in part, vacate Defendant's sentence, and remand this cause for re-sentencing.
Judgment affirmed in part, sentence vacated and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to both parties equally.
Exceptions.
Baird, P.J., Batchelder, J., concur.
[1] Chippendale required courts to consider the specific facts of the case to determine whether or not the offenses in question were allied offenses of similar import. Chippendale,52 Ohio St.3d at 121. The Ohio Supreme Court has since decidedState v. Rance, 85 Ohio St.3d 632, 1999-Ohio-291, which changed that analysis. Rance presently requires this Court to consider the statutory elements in the abstract. Rance,85 Ohio St.3d 632, at paragraph one of the syllabus. Crimes are not allied offenses of similar import unless, in the abstract, the statutory elements of the crimes "correspond to such a degree that the commission of one crime will result in the commission of the other." Rance, 85 Ohio St.3d at 638, quoting State v. Jones,78 Ohio St.3d 12, 14, 1997-Ohio-38. If the offenses are not allied offenses of similar import under Rance, they are not irreconcilable under R.C. 1.51. See State v. Hendrickson, 2nd Dist. No. 19045, 2003-Ohio-611, at ¶ 18; State v. Waldron
(Sept. 1, 2000), 11th Dist. No. 99-A-0031; State v. Rivers
(July 27, 1999), 10th Dist. No. 98AP-1322.
[2] Littleton did not testify at trial, even though the State attempted to subpoena him. His fiancée testified that she had not seen Littleton for a week, and was unsure where he was.
[3] While the police later spoke to managers at the local Ponderosa restaurants, no evidence was admitted at trial as to whether anyone had seen Defendant, Stepfather, and Edgar that evening.
[4] Edgar weighed 92 pounds at admittance to the hospital and 104 pounds when Dr. Ibrahim met with him on April 10, 2003. Dr. Ibrahim indicated Edgar should ideally weigh between 117 and 149 pounds.
[5] In Burrow, the verdict form and jury instructions given below only provided meaningful opportunity for the jury to find the defendant guilty of the lesser level of offense, regardless of the fact the indictment indicated the higher level of offense. See Burrow, 140 Ohio App.3d at 470. In this case there was simply no way that the jury could have found Defendant guilty of anything other than the fourth degree felony level of failure to provide under R.C. 2903.16(A). The court never instructed the jury on the lower level of offense.
[6] While Comer did not explicitly apply to the maximum sentence provision of the statute, we find that the rationale inComer applies to all of the subsections of R.C. 2929.19(B)(2), including R.C. 2929.19(B)(2)(d). Thus, the court must also state its reasons for imposing a maximum sentence on the record at the sentencing hearing. See Comer at ¶ 20.