[Cite as *State v. DeBartolo*, 2012-Ohio-3449.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 97453**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MICHAEL DEBARTOLO

DEFENDANT-APPELLANT

---

**JUDGMENT:**
**AFFIRMED**

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-539648

**BEFORE:** Rocco, J., Cooney, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** August 2, 2012

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Cuyahoga County Public Defender

By:   Cullen Sweeney
Assistant Public Defender
310 Lakeside Avenue
Suite 200
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

By:   Brett Kyker
         Mollie Ann Murphy
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

KENNETH A. ROCCO, J.:

{¶1} Defendant-appellant Michael DeBartolo appeals from his convictions after a jury found him guilty of involuntary manslaughter, failure to provide for a functionally impaired person, and theft.

{¶2} DeBartolo presents seven assignments of error.  In his first, second, and third, he challenges the sufficiency of the evidence presented by the state to support each of his convictions.  In his fourth, he claims the

manifest weight of the evidence does not support his convictions. In his fifth, sixth, and seventh assignments of error, he asserts the trial court abused its discretion in making the following evidentiary rulings: (1) permitting the coroner and the coroner's deputy to testify about how they arrived at their opinion on the cause of the victim's death, (2) refusing to allow evidence that the victim gave DeBartolo her durable power of attorney ("POA"), and (3) permitting certain portions of the handwriting expert's testimony.

{¶3} After a thorough review of the extensive record in this case, this court cannot find that DeBartolo's convictions were unsupported by either insufficient evidence or the manifest weight of the evidence, and cannot declare that the trial court abused its discretion with respect to evidentiary decisions. Consequently, DeBartolo's convictions are affirmed.

{¶4} DeBartolo's convictions result from his relationship with the victim, Tressa Elizabeth Carnegie. The victim was 83 years old at the time of her death in May 2008. The following facts were established by the evidence the state presented.

{¶5} The victim met DeBartolo over twenty years prior to her death at one of the places at which she was employed during her working career. DeBartolo lived in the same Lakewood, Ohio apartment building as the victim and began providing transportation to the victim when she stopped

driving. By 2003, DeBartolo accompanied the victim nearly everywhere she went.

{¶6} The victim had a married brother with whom she was not close and only one niece, Christine Fichter. Although the victim enjoyed her niece's company and had a few close friends, she had no husband or children of her own.

{¶7} In August 2004, DeBartolo moved with his roommate, Steven Kerr, to another apartment building in Lakewood. The two men leased a two-bedroom apartment on the top floor of the building that cost $1,450.00 a month to rent. Neither man, however, seemed to have outside employment, and neither filed a tax return for that year and the years that followed.

{¶8} Shortly after DeBartolo moved, he convinced the victim to move into a one-bedroom apartment next door to DeBartolo's apartment. After the move, one of the victim's close friends, Patricia Kunkel, no longer saw the victim and was unable to contact her. In the summer of 2005, Kunkel received telephone messages from the victim that raised enough concern for Kunkel to contact the Cuyahoga County Department of Adult Protective Services ("APS") and to make a report of possible neglect and/or abuse of the victim.

{¶9} In order to investigate the report, Charlene Nichols, an APS social worker, went to the victim's apartment without providing notice on August

15, 2005. DeBartolo answered the victim's door. He refused admittance to Nichols, but the victim came out into the hallway to speak briefly with the social worker. Nichols arranged another visit to take place two weeks later on August 30.

{¶10} A few days after her unannounced visit, Nichols received a letter apparently signed by the victim. The letter was dated "August 16, 2005," and indicated that Kunkel was harassing the victim by filing the APS report and that the victim had demanded of Kunkel a stop to the harassment.

{¶11} When Nichols arrived for the August 30, 2005 scheduled visit to the victim's apartment, no one answered the door. Moreover, Nichols's supervisor received a letter dated "August 30, 2005," apparently from the victim, that informed APS that she did not want its services. Nichols and another supervisor nevertheless went once more to the victim's apartment on September 2, 2005. DeBartolo answered the door. Upon seeing them, he immediately slammed it shut.

{¶12} Nichols then sent the victim a certified letter notifying her that another visit would occur on September 30, 2005. Once again on that date, Nichols was unable to obtain any response at the victim's door or by telephoning the victim. This state of affairs prompted Nichols to obtain an order from the probate court for admittance to the victim's apartment. The visit took place on November 2, 2005 with the victim, her attorney, and

DeBartolo present. Thereafter, Nichols closed the victim's APS file with the notation that the report of neglect and/or abuse remained "unclear."

{¶13} The victim held several bank accounts; she had an Individual Retirement Account ("IRA") with Morgan Stanley that she opened in 1992 and two checking accounts with KeyBank. Between October 2003 and May 2005, several checks were written from the KeyBank accounts payable to Kerr. Beginning in May 2006, several checks were written that were payable to DeBartolo and that bore a notation that they were for a "loan repayment."

{¶14} By 2007, the victim had developed a medical condition that caused her to have small seizures during which she could not control the movements of her limbs. She also had heart disease and used a wheelchair for mobility. On June 24, 2007, one of her physicians prescribed the anti-epileptic medication known as Dilantin for her and recommended that she remain on it for at least one year.

{¶15} Despite her medical conditions, the victim continued to communicate with and to visit Fichter. DeBartolo always drove the victim to Fichter's house for these visits; Fichter never went to the victim's new apartment.

{¶16} During the summer of 2007, Fichter began to notice changes in the victim's routine. Telephone calls between the two of them seemed to be

monitored by DeBartolo, who made comments "in the background" that Fichter could hear. DeBartolo always remained within sight of the victim even when she attended a wedding shower with only other women present. The victim stopped visiting Fichter's home; DeBartolo indicated part of the reason for this was because the victim occasionally was incontinent. In September 2007, although the victim attended Fichter's daughter's wedding, the victim seemed "very tired."

{¶17} That same month, Jennifer Kravec, the leasing agent for the victim's apartment building, noticed the victim "curled up" in her chair out of sight in the building's party room. The victim was "disheveled" and "crying." Kravec spoke with the victim for only a few minutes before DeBartolo appeared to "retrieve" her. Kravec thought he seemed hurried and "irritated." Kravec reported concerns about the victim to the APS.

{¶18} APS social worker Thomas Scully investigated Kravec's concerns. Scully presented himself at the victim's door on September 17, 2007. DeBartolo answered, identified himself as the victim's "caregiver," and expressed reservations about permitting Scully to be inside "alone" with the victim. Scully deferred to DeBartolo by meeting with the victim in the hallway. Scully arranged another visit to take place on September 25, 2007.

{¶19} On that date, DeBartolo permitted Scully inside the victim's apartment. The victim was having tea. She appeared well-groomed, the

apartment was neat, and DeBartolo produced an appointment book and a list of the victim's medications for Scully's review.

{¶20} On October 11, 2007, Scully returned to the victim's apartment unannounced. Once again, he could not enter; the victim came into the hallway to speak with him. Scully determined the concerns about the victim were "not validated."

{¶21} On November 19, 2007, the victim met with a new primary care physician, Dr. Matthew Faiman, for an initial assessment. DeBartolo remained in the same room with the victim during the entire visit. Faiman reviewed the victim's medical records, and agreed with her previous doctor that she should continue taking Dilantin. Faiman also noted that the victim took 14 other medications, had a medical history that included, in addition to cerebrovascular seizure disorder, heart disease, hypertension, and gastrointestinal problems, used a wheelchair, and may have had "mild cognitive impairment."

{¶22} On December 12, 2007, DeBartolo brought the victim to Faiman's office for treatment of a urinary tract infection ("UTI"). Faiman prescribed oral antibiotics. In January 2008, DeBartolo called Faiman's office on the victim's behalf to report that she was again experiencing the symptoms of a UTI. Based on DeBartolo's representation, Faiman prescribed oral antibiotics to treat the infection without requiring an office visit.

{¶23} In late January 2008, the victim called Fichter for the last time. The tone of the conversation was "very serious." Fichter's efforts to reach the victim by telephone thereafter proved unsuccessful.

{¶24} In February 2008, Fichter left a message on the victim's answering machine stating she would call the police if she did not reach someone. DeBartolo called in response to this message; he told Fichter that the victim had fallen on Valentine's Day, injuring her ribs, but that he would bring her to Fichter's house for a visit.

{¶25} The visit occurred in March 2008 in Fichter's driveway. The victim remained in DeBartolo's car as Fichter took DeBartolo's place in the driver's seat; the victim was "slumped," appeared to be in pain, and wanted only to go home.

{¶26} At around this time, DeBartolo called Dr. Faiman's office to request medication for the victim for "restlessness"; he did not indicate that the victim had suffered injury in a fall. DeBartolo was informed that Faiman would need to see the victim and was offered an appointment, but DeBartolo indicated that the time was inconvenient and that he would call back.

{¶27} On April 11, 2008, DeBartolo called Dr. Faiman's office at 9:26 a.m. and spoke with registered nurse Theresa Fenohr. DeBartolo reported that the victim's left leg had been "blue" for "a week," so she needed an office

appointment. In describing the problem, DeBartolo denied that the victim had suffered any injury to her leg that would account for the condition.

{¶28} Fenohr told DeBartolo that the condition sounded life threatening and that he should obtain immediate emergency treatment for the victim. DeBartolo disagreed; his response was that the victim probably had only either "phlebitis" or "a clot" and did not need emergency care. Fenohr indicated those conditions also were life threatening. By the end of the conversation, Fenohr believed she had persuaded DeBartolo that the situation was extremely serious.

{¶29} That same day, at approximately 11:00 a.m., as Linda Schwering cleaned on the top floor of the victim's apartment building, she noticed the victim's door stood open. Schwering looked in to see DeBartolo holding up the victim under her shoulders. To Schwering, the victim "looked like a rag doll"; she was limp and insensible. DeBartolo saw Schwering and told her the victim wasn't "having a good day."

{¶30} Schwering finished her duties and proceeded to the building office, where she watched the surveillance cameras' monitors. At 11:20 a.m., she saw DeBartolo, accompanied by Kerr, pushing the victim in her wheelchair out of the elevator into the garage. The victim was wearing a hat and was "slumped over." DeBartolo transferred her into his car, Kerr

returned with the victim's wheelchair to the elevator, and DeBartolo drove away.

{¶31} The victim arrived at the Cleveland Clinic (the "Clinic") Emergency Department at 11:57 a.m. that morning. Michael Surratt, the nurse who attended her, found her vital signs upon arrival were "so low that everything had to be supported." The victim was "critically ill" and verbally unresponsive.

{¶32} The victim's initial diagnoses consisted of "septic shock, presumed urosepsis, respiratory failure, seizures, and acute renal failure." She was placed on a ventilator, X-rays were obtained of her legs and torso, and, on April 12, 2008, she was admitted to the intensive care unit.

{¶33} Dr. Jorge Guzman, the Clinic's intensive care physician, oversaw the victim's treatment from April 11, 2008 until May 2, 2008. He agreed with the initial diagnoses of seizure, septic shock, urosepsis, respiratory failure, and acute renal failure. Guzman never saw the victim conscious.

{¶34} On April 14, 2008, Clinic social worker Mary Beth Hyland received an assignment to the victim's case. DeBartolo's name appeared as the victim's "emergency contact" in her medical records, so Hyland telephoned DeBartolo to ask some questions. DeBartolo told Hyland that the victim was "almost in assisted living" because of the extent of the care he provided. He indicated that he cooked all her meals and helped her to dress. Hyland

requested that he provide his medical POA for the victim, and arranged to meet him in the victim's room on April 16, 2008.

{¶35} Upon DeBartolo's arrival at the victim's bedside, he did not provide the medical POA. Hyland demanded explanations for the "scratches" and bruises on the victim's body. Although DeBartolo asserted the victim must have been "scratching herself," he could not explain the bruises. He stated that he was the victim's caregiver, that he and "the couple people working for him" in his real estate business cared for her so she was never alone, that he placed a "baby monitor" in her room so he could always hear her, and that he made sure her "spiritual needs" were met.

{¶36} Hyland continued to have contact with DeBartolo, and his statements proved so odd and unsatisfying as to lead Hyland to make a report about his possible exploitation or neglect of the victim to the APS. Shortly thereafter, she was removed from the victim's case.

{¶37} On April 23, 2008, as a result of Hyland's report, APS social worker Vanessa Anderson contacted DeBartolo. In response to her questions, DeBartolo claimed that he took the victim to the Clinic because he had noticed her leg was discolored "the day before," the victim was "alert" prior to the trip to the Clinic on April 11, she "determin[ed] what bracelet would go with her necklace" before they left, and she suffered a seizure on the way.

{¶38} On April 24, 2008, Clinic social worker Terrance Roncagli was assigned to the victim's case. Roncagli noted that the medical POA that DeBartolo had produced for the victim bore no notary seal. Roncagli arranged a "patient care conference" with DeBartolo to obtain information.

{¶39} At the meeting, DeBartolo stated that he was the victim's "nephew, that his mother was the [victim's] sister." He further stated that he was the victim's caregiver. Several times during the meeting, DeBartolo expressed "rage" at what he saw as Hyland's interference.

{¶40} When Roncagli brought up the subject of the victim's medications before her hospitalization, DeBartolo "expressed doubt" that her doctors had properly diagnosed her medical conditions. Moreover, DeBartolo gave his own "medical opinions" about the victim's conditions and stated he "read somewhere" that she would do better if she were "off of" Dilantin. He told Roncagli that he had stopped giving Dilantin to the victim on December 24, 2007.

{¶41} On April 30, 2008, Anderson reported her concerns about the victim to the Lakewood Police Department. Det. James Motylewski eventually was assigned to investigate the case.

{¶42} On May 2, 2008, the Clinic discharged the victim and transferred her to a long-term care facility located at Fairview Hospital. DeBartolo arranged to drive Fichter and her daughter there for a visit.

{¶43} On the way to the hospital, DeBartolo handed Fichter an envelope that contained documents she had never previously seen. One was entitled "Last Will and Testament" of the victim and dated July 31, 2003; it indicated DeBartolo was her sole beneficiary. Another was entitled "Agreement" and dated October 28, 2005; it indicated that DeBartolo loaned the victim $130,000.00 in 1988 for the purchase of a condominium.

{¶44} On May 14, 2008, the victim died. Dr. Erica Armstrong performed an autopsy on the victim's body the following day. Based on her examination and review of the medical records and reports she received, Armstrong determined the cause of death was sepsis with respiratory and renal failures due to infection. Armstrong determined the manner of death as homicide.

{¶45} On that basis, Motylewski's investigation of the APS report on the victim became a homicide investigation. Motylewski learned from another witness that the rent for the victim's apartment remained current. On July 3, 2008, he executed a search warrant of the victim's apartment.

{¶46} Upon entry, Motylewski observed clothing and other indications that the apartment was in use by a man. Motylewski recovered several pieces of mail addressed to DeBartolo and Kerr.

{¶47} The legal documents Motylewski recovered as a result of the search consisted of a living will and a durable POA, both signed by the victim

dated 1997, and both appointing her brother as her representative. Motylewski noted the presence of several unopened and out-of-date bank statements addressed to the victim at her former apartment; the only current statements were from credit card companies that were addressed to "T. E. Carnegie" at the victim's most recent address.

{¶48} Motylewski also recovered an appointment book in which only the months of Scully's APS investigation had several entries. Motylewski found no prescription bottles bearing the victim's name that were dated after 2002.

{¶49} Thereafter, Motylewski continued his investigation of the victim's death by contacting banking institutions, medical personnel, social workers, and friends and family. On August 31, 2010, DeBartolo ultimately was indicted with Kerr in this case on four counts, viz., one count of involuntary manslaughter, two counts of failure to provide for a functionally impaired person, and one count of theft. The state dismissed one count of failure to provide for a functionally impaired person prior to trial.

{¶50} After considering all of the evidence, the jury found DeBartolo guilty on each of the three remaining counts. DeBartolo received a prison sentence that totaled three years for his convictions. He presents seven assignments of error in this appeal, as follow; they will be addressed together when appropriate.

"I.   Michael DeBartolo's conviction for failure to provide for a functionally impaired person is not supported by legally sufficient evidence as required by state and federal due process.

"II.   Michael DeBartolo's conviction for involuntary manslaughter is not supported by legally sufficient evidence as required by state and federal due process.

"III.   Michael DeBartolo's conviction for theft of property in excess of $25,000 is not supported by legally sufficient evidence as required by state and federal due process.

"IV.   Michael DeBartolo's convictions are against the manifest weight of the evidence.

"V.   The trial court erred in permitting the deputy coroner and coroner to opine that Elizabeth Carnegie's death was a homicide when that opinion was not based on facts or data perceived by the expert or admitted in evidence at trial.

"VI.   The trial court erred in failing to admit Elizabeth Carnegie's durable power of attorney and in failing to permit Amanda Winters to testify about Carnegie's statements to her about the power of attorney.

"VII.   The trial court erred and violated DeBartolo's due process rights by permitting the state to present opinion testimony

**from a handwriting expert that went beyond her expertise and that had minimal probative value that was substantially outweighed by the danger of unfair prejudice and misleading the jury."**

{¶51} Because DeBartolo's fifth, sixth, and seventh assignments of error all present challenges to the admissibility of evidence, they will be addressed prior to his first four assignments of error, each of which challenges the sufficiency and manifest weight of the evidence presented in support of his convictions.

{¶52} In addressing DeBartolo's fifth, sixth, and seventh assignments of error, this court is guided by the appropriate analysis of the issue he presents. The Ohio Supreme Court set forth that analysis in *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 569 N.E.2d 1056 (1991), as follows:

> Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence. The admission of relevant evidence pursuant to Evid.R. 401 rests within the sound discretion of the trial court. *E.g., State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. An appellate court which reviews the trial court's admission or exclusion of evidence must limit its review to whether the lower court abused its discretion. *State v. Finnerty* (1989), 45 Ohio St.3d 104, 107, 543 N.E.2d 1233, 1237. As this court has noted many times, the term "abuse of discretion" connotes more than an error of law; it implies that the court acted unreasonably, arbitrarily or unconscionably. E.g., *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

{¶53} DeBartolo first claims that the trial court abused its discretion when it permitted the coroner and his assistant to explain their reason for a verdict of homicide as the manner of the victim's death, because that conclusion was based in part on information gained outside the autopsy itself. He claims the testimony violated Evid.R. 703. His claim lacks merit.

{¶54} R.C. 313.12 places the coroner under a statutory duty to investigate an unusual death. Pursuant to R.C. 313.17, the coroner's report with respect to such a death "*shall be made* from the personal observation by the coroner or his deputy of the corpse, from the statements of relatives or other persons having any knowledge of the facts, and *from such other sources of information as are available*, or from the autopsy." (Emphasis added.)

{¶55} Thus, the coroner also is placed under a statutory duty to examine any information relating to the death that is available, including police and APS reports and witness statements. In *State v. Jacks*, 63 Ohio App.3d 200, 578 N.E.2d 512 (8th Dist. 1989), this court noted:

> It is well established that a coroner testifies as an expert witness to *assist the jury* in determining the cause of death. *Vargo v. Travelers Ins. Co.* (1987), 34 Ohio St.3d 27, 30, 516 N.E.2d 226, 229; Evid.R. 702. * * * . See, also, R.C. 313.19. Further, the coroner's conclusion "as to the cause of death and the manner and mode in which the death occurred is entitled to much *weight.*" *State v. Manago* (1974), 38 Ohio St.2d 223, 227, 67 O.O.2d 291, 293, 313 N.E.2d 10, 13. (Emphasis added.)

{¶56} From the foregoing, the trial court properly determined that the coroners' testimony was admissible; Evid.R. 703 states that the "facts or data" upon which an expert witness "bases an opinion or inference *may* be those perceived by the expert or admitted in evidence." (Emphasis added.) The rule does not *require* the facts or data to be admitted into evidence.

{¶57} In this case, as in *Jacks*, the coroners both opined the death was a homicide, and provided the jury with the reasons for their determination. *State v. Heinish*, 50 Ohio St.3d 231, 553 N.E.2d 1026 (1990); *State v. Cohen*, 11th Dist. No. 12-011, 1988 WL 41545. The defense was free to offer evidence to rebut the coroner's testimony, and, in fact, it did. *Vargo*.

{¶58} Based on the foregoing, the trial court neither violated Evid.R. 703 nor abused its discretion when permitting the coroners to testify as to their opinion of the manner of the victim's death based, in part, upon sources outside the autopsy itself. *State ex rel. Blair v. Balraj*, 69 Ohio St.3d 310, 631 N.E.2d 1044 (1994).

{¶59} DeBartolo also argues that the trial court abused its discretion in excluding testimony and a defense exhibit that would have shown that the victim gave DeBartolo her durable POA. A review of the record fails to support his argument.

{¶60} As to the defense witness, Amanda Winters, the testimony she was prepared to give constituted hearsay in contravention of Evid.R. 802.

"Hearsay" is defined in Evid.R. 801(C) as "a statement, other than one made by the declarant while testifying at the trial * * * offered in evidence to prove the truth of the matter asserted."

{¶61} By recounting a conversation Winters had with the victim, Winters sought to prove that, to Winters's understanding, the victim gave DeBartolo her durable POA. Because this testimony was inadmissible, the trial court properly excluded it.

{¶62} As to the document, the trial court determined that Winters could not authenticate it as required by Evid.R. 901(A). Moreover, the record reflects the defense actually did not seek to introduce this document as an exhibit; it was proffered only to show that one of the potential defense witnesses had died by the time the state indicted DeBartolo. Therefore, the trial court did not abuse its discretion in excluding this evidence.

{¶63} DeBartolo further claims that the trial court abused its discretion in permitting state's witness Jessica Toms, who was qualified as a handwriting expert, to opine that some of the documents she reviewed contained what appeared to be attempts to copy the victim's signature. DeBartolo complains that Toms's opinion in this regard did not constitute a "recognized scientific conclusion." However, as authority for his claims, he cites only Evid.R. 403.

{¶64} Evid.R. 705 provides that an expert "may testify in terms of an opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data." Because a review of the challenged testimony reveals compliance with the foregoing rule, the trial court committed no abuse of its discretion in permitting Toms to explain her conclusion.

{¶65} DeBartolo's fifth, sixth, and seventh assignments of error, accordingly, are overruled.

{¶66} In his first, second, and third assignments of error, DeBartolo argues that none of his three convictions was supported by sufficient evidence, so the trial court improperly denied his motions for acquittal of the charges. He asserts in his fourth assignment of error that all of his convictions are unsupported by the manifest weight of the evidence.

{¶67} When reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court examines the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Whether the

evidence is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶68} In evaluating a challenge to the verdict based on the manifest weight of the evidence, on the other hand, a court sits as the "thirteenth juror," and intrudes its judgment into proceedings only that it finds to be fatally flawed through misapplication of the evidence by a jury that has "lost its way." *Id.* As the Ohio Supreme Court stated:

> Weight of the evidence concerns the "inclination of the greater amount of credible evidence offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." * * *
> The court, reviewing the entire record, weighs the evidence and all

reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶69} In *State v. Bruno*, 8th Dist. No. 84883, 2005-Ohio-1862, this court cautioned that a reviewing court must be mindful that the weight of the evidence and the credibility of witnesses are matters primarily for the trier of fact to assess. Therefore, a reviewing

court will not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the prosecution proved the offense beyond a reasonable doubt. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus; *State v. Eley*, 56 Ohio St.2d 169, 383 N.E.2d 132 (1978). Moreover, in reviewing a claim that a conviction is against the manifest weight of the evidence, the conviction cannot be reversed unless it is obvious that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Garrow*, 103 Ohio App.3d 368, 370-371, 659 N.E.2d 814 (4th Dist.1995).

{¶70} DeBartolo was convicted in Count 3 of violating R.C. 2903.16, failing to provide for a functionally impaired person. The relevant portion states:

(B) No caretaker shall recklessly fail to provide a functionally impaired person under the caretaker's care with any treatment, care, goods, or service that is necessary to maintain the health or safety of the functionally impaired person when this failure results in serious physical harm to the functionally impaired person.

{¶71} Thus, the state's evidence had to show: (1) the victim was a functionally impaired individual, (2) DeBartolo was a caretaker for the victim, (3) DeBartolo recklessly failed to provide the victim with treatment or care necessary to maintain her health or safety, and (4) this failure resulted in serious physical harm to the victim. *State v. Davis*, 9th Dist. No. 21794, 2004-Ohio-3246, ¶27. Although DeBartolo argues that the

state did not meet its burden with respect to these necessary elements, when viewed in a light most favorable to the state, his argument fails.

{¶72} Fichter testified that, by September 2007, the victim had suffered a heart attack, could neither drive nor ambulate, DeBartolo drove the victim everywhere, and the victim suffered from an illness that made her lose control of her limbs. Margaret Lucko indicated that, by September 2007, the victim could not go to the bathroom by herself. Armstrong testified that, during the autopsy of the victim's body, she observed in analyzing the victim's brain a significant amount of atrophy that suggested the victim had dementia.

{¶73} DeBartolo indicated to Hyland that, prior to the victim's hospitalization, she required constant monitoring. DeBartolo also told Hyland that, in his care, the victim for all intents and purposes was "in assisted living."

{¶74} DeBartolo described himself to Scully, Roncagli, and other Clinic personnel as the victim's caregiver. Many of the witnesses who knew the victim prior to her hospitalization had not seen the victim without DeBartolo in attendance.

{¶75} DeBartolo indicated to both Dr. Faiman and Roncagli that he made medical decisions for the victim, and that he believed she did not require Dilantin. DeBartolo told the Clinic's emergency personnel that the

victim stopped taking Dilantin in December 24, 2007. Armstrong testified that when the victim arrived at the emergency room, she had a "subtherapeutic" level of Dilantin in her blood. Therefore, the victim would have continued to suffer seizures. DeBartolo told the Clinic's emergency room personnel that the victim suffered a seizure on the drive to the hospital; when the victim arrived, she was already in a medically critical condition.

{¶76} DeBartolo called Dr. Faiman's office in January 2008 to request additional medication for the victim for a UTI that she apparently could not overcome. In light of the victim's incontinence, she was prone to such an infection.

{¶77} DeBartolo also called Dr. Faiman's office on the morning of April 11, 2008; he told the nurse that the victim's leg had been "blue" for "a week," thereby indicating that he did not believe the condition required his prompt attention, in spite of the victim's history of vascular problems. Added to that, despite Fenohr's urging to get medical attention for the victim "immediately," DeBartolo waited a few hours before he drove the victim to the emergency room.

{¶78} When Schwering saw the victim at 11:00 a.m., she was already barely conscious. Even when the victim was in this condition, DeBartolo did not summon an ambulance, rather, he decided to drive the victim to the

Clinic. Indeed, before they left the building, DeBartolo made sure the victim was nicely dressed and wearing a hat.

{¶79} Based upon the evidence, the trial court properly denied DeBartolo's motion for acquittal on the charge of failure to provide for a functionally impaired person. *Davis*, 9th Dist. No. 21794, 2004-Ohio-3246.

{¶80} Similarly, the state's evidence was sufficient to prove DeBartolo's failure to provide medical care for the victim led to her death, as required for a conviction for involuntary manslaughter.

{¶81} According to both the coroner and his assistant, the victim's cause of death was "psuedomonas aeruginosa sepsis with acute respiratory failure and acute renal failure due to pseudmonas aeruginosa wound infection." The coroner specifically testified that medical conditions the victim had on April 10, 2008, contributed to her death, including the "seizure disorder, urosepsis, and hypertensive atheroschlerotic cardiovascular disease."

{¶82} Simply put, the coroner indicated that, by April 11, 2008, the bacteria that caused the UTI had spread in the victim's system, and that, because her pre-existing diseases compromised her resistance, her body succumbed to septic shock, which ultimately led to her death. DeBartolo, who by his own admission made medical decisions for the victim, nevertheless

thought it unnecessary to take the victim to see a physician after her last appointment in December 2007.

{¶83} DeBartolo also asserts that the trial court erred in denying his motion for acquittal on the theft charge. He contends that the notations on the victim's checks demonstrated she owed him money for a loan on her purchase of a condominium, and that no evidence indicated he obtained money "beyond the scope of the express or implied consent" of the victim, as required by R.C. 2913.02(A)(2). This court disagrees.

{¶84} In a letter written to Fichter's relatives dated June 27, 2008, DeBartolo stated, "Despite an allegation by [Fichter] that [the victim] owns or owned a condominium, she has never owned one *at any time*. * * * [The victim] has no equity * * * in any real estate." (Emphasis added.) Moreover, many checks were written on the victim's checking accounts that were signed with her name and dated while she was in the Clinic in a comatose state.

{¶85} DeBartolo states in his appellate brief that "given that [he] helped [the victim] manage her affairs, it would be quite normal for him to have access to pay her bills and other expenses." The evidence presented by the state, however, showed DeBartolo's access exceeded the "normal."

{¶86} According to the bank records, beginning in July 2007, ATM withdrawals in $100 to $300 amounts were made from the victim's checking

account two or three times per week. This activity continued after DeBartolo took the victim to the hospital. It also occurred after the victim's death. DeBartolo had the victim's unopened bank statements in his apartment.

{¶87} Moreover, on May 2, 2008, the victim, who had been unconscious since April 11, was transferred into a long-term care facility. On May 9, 2008, the institution holding the victim's ("IRA") received a form that was purportedly from the victim because it bore the signature "T. E. Carnegie." The form was dated "May 8, 2008."

{¶88} This document directed that the victim's IRA account was to be closed and that the balance of $15,000 be distributed to her in the form of an check. The institution complied. On May 29, 2008, that same sum was deposited into a new account that had been opened at Fifth Third Bank on May 10, 2008 under the name "Carnegie DeBartolo." Kerr was the sole signatory on the account.

{¶89} Based on DeBartolo's apparent control over the victim's finances, when viewed in a light most favorable to the prosecution, a reasonable juror could find that DeBartolo used his access to the victim's account to commit theft.

{¶90} Accordingly, DeBartolo's first, second, and third assignments of error are overruled.

{¶91} DeBartolo's claim that his convictions are against the manifest weight of the evidence is also rejected. As DeBartolo does in his appellate brief, "[f]or the sake of brevity," this court "incorporates its discussion from the first three assignments of error." The jury acted within its prerogative to believe the state's evidence, because two of the defense witnesses made significant concessions in their testimony. One conceded that the victim's disabilities made her suitable for "assisted living," and another testified, without objection, that, in his presence, the victim directed DeBartolo to "make out" one of her checks. *Davis*, 9th Dist. No. 21704, 2004-Ohio-3246.

{¶92} DeBartolo's convictions are affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KENNETH A. ROCCO, JUDGE

COLLEEN CONWAY COONEY, P.J., and
SEAN C. GALLAGHER, J., CONCUR